## Case No. 9,346.

### The MAY FLOWER.

[3 Ware, 300.] [1]

District Court, D. Maine. Aug., 1863.

SHIPPING—GOODS ON BOARD — BILL OF LADING— DUTY TO GIVE—PROVISIONS OF.

1. When goods are laden on board of a vessel, the master is bound by the contract to give a bill of lading of them. But a bill of lading, in its essence, only contains a receipt of the goods with a promise to carry and deliver them according to the terms of the contractor.

[Cited in Robinson v. Memphis & C. R. Co., 9 Fed. 139.]

2. The price of the carriage and delivery is no essential part of the instrument, and is inserted merely for the convenience of the parties. If it is not agreed upon, or there is a misunderstanding between the parties on this point, the master is not obliged to give a bill of lading determining the freight.

In admiralty.

Mr. Gilbert, for libellant.

Mr. Fox, for respondent

WARE, District Judge. Mr. Tiffany, a merchant of New York, wishing to ship a quantity of ice to New Orleans, for the purpose of obtaining a vessel for that use, visited the Kennebec and hired the lower hold of the May Flower, of Mr. Hagar, of Richmond. By the terms of the agreement, he was to have the whole of the lower hold but no other part of the ship. The freight which he was to pay for the exclusive use of that part of the vessel, is partially, but not fully agreed, and out of this difference of opinion the present controversy has arisen. The May Flower was a new ship, having never made a voyage. By the United States admeasurement, she

measured 899 tons, but her real carrying capacity was supposed to be considerably greater. For the purpose of ascertaining nearly what that was, Mr. McCarting, an agent of Mr. Tiffany, together with Mr. Hagar, was deputed to make a rough admeasurement of the vessel. They reported that she could carry, in the lower hold, 1,200 tons or more. On this report Mr. Tiffany agreed to pay $10,000 for the lower hold. So far is agreed by the parties. But it is alleged in the answer that the whole agreement was, that $10,000, at least, as a gross sum, should be paid, but if the quantity actually laden should exceed that sum, calculated at $9.75 per ton, then for the use of that part of the ship, should be paid for every ton so laden at that rate, to wit, $9.75 per ton. The ship completed her lading at Bath, where she took, including what was laden at Richmond, 1,233 tons. The agent of the shipper, Mr. McCarting, then demanded a bill of lading in the common form, hiring the freight at $10,000 a gross sum. This the master refused by the direction of Mr. Hagar, but offered one in conformity with the agreement as understood by him, fixing the freight at $9.75 per ton. It does not appear, from the evidence, that a bill in any other form than that in which the freight was determined was mentioned on either side.

On this state of the case a question was raised by the counsel for the claimant, whether he was bound to give any bill of lading, the bargain being merely for the transportation and delivery of the goods, and nothing was said in the contract of a bill of lading. The want of a decision on this point may be accounted for in different ways. One mode is, that the delivery of a bill of lading is so much a matter of course that no master has ever refused it when demanded, or has thought it worth the expense to contest the legality of the demand. But there must always be a first case, and the true question is, whether he was bound by law to deliver one. My opinion is, that he was so bound. All contracts bind the parties according to their common intention, when that can be clearly ascertained, not that of one party or of the other, but of both; and this whether the intention is expressed by words or not. By a contract, generally, a party binds his heirs and personal representatives, though they are not commonly named, for he binds all his property for the performance of it. This addition is annexed by the law. But customs and usages may annex terms and conditions to a contract, as well as positive law, and even vary the meaning of words actually used. In the case of Smith v. Wilson, 3 Barn. & Adol. 728, custom was allowed to change the meaning of a word which has as definite a signification as any in the language. In that contract, which related to rabbits, one thousand was held, according to the common intention of the parties, to mean one hundred dozen or twelve hundred. And

this decision is confirmed by others of a like character. This was a land contract, but mercantile contracts are almost always elliptical, leaving something to be understood which is not expressed, and custom and usage may add terms and conditions to a contract as well as law. Indeed, almost all our mercantile law is the mere adoption, by the courts, of the customs of merchants. Contracts are conventions, says Domat, Lois Civiles, liv. 1, tit. 1, § 3, No. 1, bind the parties, not only by their words, but to all which is demanded by the nature of the contract, by the law and by custom, unless these consequences are expressly excluded. When the owner agreed to carry the ice, he bound himself just as much to give a receipt for it, with a promise to deliver it in the usual terms, as he did to carry it. Such a receipt and promise is just as much expected by the master as the shipper. It is included, by the common understanding, in the general contract. My opinion, therefore, is, that a bill of lading to this effect, he was bound by the contract to give. It is of the essence of a bill of lading, that it contains a receipt for the goods with a promise to carry and deliver them, for this the master promises, and it necessarily contains nothing more. But, for convenience, it is usual to insert also the sum to be paid for their carriage. And if this is agreed, as is usually the case, it may, very suitably, be inserted. But this instrument is commonly given after the goods are received and stowed. It is given by the master. And if the freight is either not agreed, which is certainly uncommon, or there is a misunderstanding on this point between the shipper and the master, or owner, what is to be done? The giving of a bill of lading is the master's own act. It is a very ancient document, probably as old as maritime trade, and highly respected. And though not conclusive between the owner of the goods and the vessel, it is at least prima facie evidence, and if indorsed for a valuable consideration, it is conclusive between such purchasers and the ship owner or master. 5 Pars. Mar. Law, c. 7, § 2. The master is not obliged to furnish evidence against himself, especially when the truth of this he does not admit. He was thus justified in refusing such a bill of lading, and he is then standing only for his legal right in refusing one, stating the freight at a higher rate than what he understood it. And such a bill only was demanded. It does not appear that one in any other form was mentioned or thought of by either party, and such an one the master was not bound to give. The amount of the freight not being agreed upon between the parties, this might, perhaps, be determined by a libel for not giving a bill of lading framed for that purpose. But the libel is not framed with that view, and it may as well be determined in a libel for the freight, if the ship carries it in safety to its port of delivery. And as, by the contract, the freight is to be paid at New York

and not New Orleans, it may be more conveniently settled there. In the mean time no wrong can be done, as the manifest shows the amount of ice laden. The libel is dismissed with costs.

MAY FLOWER, The. See Case No. 6,147.